JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Patrick Cahill appeals from a judgment of the domestic relations division of the common pleas court setting the duration of his marriage from November 30, 1984 to July 11, 2002, thus ordering him to pay spousal support to appellee Geraldine Patronite. On appeal, he assigns the following error for our review:
 {¶ 2} "The judgment of the trial court overruling the objections of the plaintiff-appellant was against the manifest weight of the evidence and an abuse of discretion."
 {¶ 3} Having reviewed the record and pertinent law, we affirm the judgment of the court. The apposite facts follow.
 {¶ 4} Patrick Cahill and Geraldine Patronite were married on November 30, 1984. Both had been married before and both had children from their respective prior marriages. No children were born as issue to this marriage. After three years of marriage, the parties separated in late 1987.
 {¶ 5} After almost fourteen years of separation, on April 27, 2001, Cahill filed a complaint for divorce in domestic relations court. After protracted pretrial litigation, trial of this matter commenced July 11, 2002, before a domestic court magistrate.
 {¶ 6} At the trial that ensued, Patronite, age sixty-two, testified she was working for a veterinarian when she and Cahill married in 1984, but was unhappy with the job and later quit. After they married, Cahill negotiated the sale of a restaurant owned by her family, and used the commission to purchase a gas station. She stated this was supposed to be an investment for them and a source of income for her. The gas station was profitable for the first few years, but failed due to rising gasoline cost and the need to replace the aging underground tanks.
 {¶ 7} Patronite testified the gas station was the only asset the parties acquired during the marriage. She had a home that was fully paid for at the time the parties married. They did not maintain joint bank accounts, nor establish any joint credit. She described their standard of living as "normal", and stated they did not travel or go out much.
 {¶ 8} Patronite stated since the separation and the closing of the gas station, she has provided day care services in her home. She stated she has little or no taxable income after expenses, and her income varies according to the number and ages of the children. She stated she currently provided day care services for two children. She stated her gross receipts were $11,918 in 1999, $9,903 in 2000, and $8,642 in 2001.
 {¶ 9} Patronite further testified she shares her home with an adult daughter and the daughter's three children. The adult daughter does not pay rent, but contributes to the household by buying groceries, doing yard work and cleaning. Patronite said her parents provide her with $100 to $200 per month if she needs it, and twelve years prior they paid for a $60,000 addition to her home. She further stated she has a home equity line of credit in the amount of $13,000 taken out to pay expenses.
 {¶ 10} Patronite testified Cahill left the marriage in late 1987 to cohabit with another woman. She stated throughout their separation, with the exception of the preceding two years, Cahill, to her knowledge, had cohabited with several different women.
 {¶ 11} She said after the separation she and Cahill maintained a cordial and accommodating relationship with each other. She said they sometimes went to breakfast and dinner together, and until about four years ago, took trips together, at times accompanied by members of their respective families. She testified Cahill visited her home on holidays and gave gifts to her children. She testified for a time she did Cahill's laundry, for which he paid her $100 per month.
 {¶ 12} She stated they filed joint tax returns until approximately 1996, and Cahill prepared her tax return for her day care business until approximately 2000. She testified she was covered under Cahill's health insurance through his employment.
 {¶ 13} Finally, Patronite testified in 1993 she and Cahill each executed documents entitled " Agreement for Release of Inchoate and Consummate Dower" which expressly waived any rights in the real or personal property of each other. Patronite said her attorney prepared the documents and the purpose was to sign off on each other's homes.
 {¶ 14} Cahill, age 64, testified after the parties separated, he went back to school, became a certified public accountant, and established two subchapter "S" corporations. The first, Patrick J. Cahill, CPA Associates, Inc., which he started with his son, prepares individual, corporate and partnership tax returns, as well as financial statements for about fifty companies. The second company, Cahill Management and Investments, Inc., of which he has a one-third interest, handles the sale of bars and restaurants. He said his total income from these two companies was approximately $12,500 for tax year 2000.
 {¶ 15} Cahill further testified he is employed full-time as a finance director of Commercial Traffic Company at an annual salary of $62,000. He said he always paid for medical insurance coverage for Patronite through his employer, and this currently cost him an extra thirty-five percent over single coverage.
 {¶ 16} Cahill stated he purchased a home in 1991 which is now valued at $160,000. He has a first mortgage balance of $97,000 and a second mortgage line of credit balance of $42,000. He said the combined monthly payment on the house is approximately $2,500. He further testified his monthly expenses were about $6,000, and this amount included the service of credit cards debts associated with his business.
 {¶ 17} On November 7, 2002, the magistrate issued her findings and conclusion. The decision ordered Cahill to pay $499.80 per month as spousal support for a period of three years or until either party's death or the remarriage of Patronite. Additionally, Cahill was ordered to pay $3,000 towards Patronite's attorney fees. Cahill objected to the magistrate's decision, and his objection was overruled.
 {¶ 18} Cahill now appeals arguing it was an abuse of discretion for the trial court to order spousal support.
 {¶ 19} R.C. 3105.18(C)(1) sets forth the factors which the trial court must consider in determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, terms of payment, and duration of spousal support. The factors relevant in this case are: (1) the parties' income, including income derived from property divided; (2) the relative earning abilities of the parties; the ages and the physical, mental, and emotional conditions of the parties; (3) the retirement benefits of the parties; (4) the duration of the marriage; (5) the standard of living of the parties established during the marriage; (6) the relative extent of education of the parties; (7) the relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties; (8) the tax consequences, for each party, of an award of spousal support; and (9) any other factor that the court expressly finds to be relevant and equitable.[1]
 {¶ 20} The trial court enjoys wide latitude in determining the appropriateness as well as the amount of spousal support.[2] Such an award will not be reversed unless a reviewing court, after considering the totality of the circumstances, finds that the trial court abused its discretion.[3] The term "abuse of discretion" connotes more than an error of law or judgment, it implies that the court's attitude is unreasonable, arbitrary or unconscionable.[4]
 {¶ 21} In making a spousal support award, "a trial court must consider all of the relevant factors in [R.C. 3105.18] *** then weigh the need for support against the ability to pay."[5] The resulting award must be fair, equitable and in accordance with the law.[6] "An equitable result requires that to the extent feasible, each party should enjoy, after termination of a marriage, a standard of living comparable to that established during the marriage as adjusted by the various factors of [R.C. 3105.18]."[7]
 {¶ 22} Cahill argues the trial court should have used the date of separation as the de facto termination date of the marriage. In divorce cases, we presume the date of the final hearing is the appropriate termination date of the marriage unless the court, in its discretion, uses a de facto termination.[8]
 {¶ 23} In the instant case, the trial court adopted Cahill's argument that for property division purposes there should be a de facto termination of the marriage effective as of the date of the parties' separation in 1987. The trial court's stated reasons were (1) the lengthy period of time they were separated fourteen an one-half years as of the time of trial, (2) their mutual assent to live separate lives, (3) the fact each took steps to protect his/her property from the other and to avoid any true financial interdependence, (4) the fact they had no joint assets, accounts or debts and (5) that they maintained the legal status of "married" in form only but not in function.[9]
 {¶ 24} In making the determination of spousal support pursuant to R.C. 3105.18(C), the trial court found pivotal Patronite's continued need for medical insurance coverage. The trial court stated had the parties divorced in 1987, when Patronite was forty-seven years old she would have had to seek employment that would have provided medical coverage. Instead, for almost fifteen years Cahill provided this coverage and Patronite came to rely on it. Now at age sixty-two, with only a high school diploma, no special skills and a limited work history, it is unlikely she would be able to obtain employment providing full health care benefits.
 {¶ 25} We acknowledge this is a peculiar set of circumstances and the record is devoid of any indication for the reason why the parties waited almost fifteen years to file for divorce. Although Cahill initiated the separation and Patronite acquiesced to the arrangement that followed, both parties enjoyed certain benefits stemming from their legal status as "married," such as Patronite's eligibility for health care coverage, and the benefits of filing joint tax returns. At the same time, they both took measures to avoid certain entanglements which would normally result from the marital union, such as executing mutual release of dower.
 {¶ 26} The precise date upon which any marriage irretrievably breaks down is extremely difficult to determine, and this court will avoid promulgating any unworkable rules with regard to this determination. It is the equitableness of the result reached that must stand the test of fairness on review.[10]
 {¶ 27} Given the unique circumstances, the trial court's decision awarding spousal support to Patronite for the next three years will allow her to attain the age of sixty-five and be eligible for Medicare. The spousal support will be taxable income to Patronite and an adjustment to income for Cahill.
 {¶ 28} We conclude the trial court properly awarded spousal support given the peculiar facts of the case.
 {¶ 29} Cahill also argues the trial court erred in awarding attorney fees to Patronite.
 {¶ 30} R.C. 3105.18(H) authorizes a trial court to award attorney fees to either party during divorce proceedings. That section provides, in part:
 {¶ 31} "In divorce * * * proceedings, the court may award reasonable attorney fees to either party at any stage of the proceedings, *** if it determines that the other party has the ability to pay the attorney fees that the court awards. When the court determines whether to award reasonable attorney fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating his rights and adequately protecting his interests if it does not award reasonable attorney fees."
 {¶ 32} Thus, pursuant to this section, the trial court must consider the following criteria in determining whether to award attorney fees: (1) the ability of the non-moving party to pay the fees; and (2) whether a party will be prevented from litigating his or her rights if fees are not awarded. Further, if the trial court determines that an award of attorney fees is warranted, the court must subsequently determine the reasonableness of the amount of fees requested.[11]
 {¶ 33} As a general rule, an award of attorney fees in a domestic relations action is within the sound discretion of the trial court.[12]
On appeal, the reviewing court is limited to determining whether the factual conclusions upon which the trial court based the exercise of its discretion were against the manifest weight of evidence, or whether there was an abuse of discretion.[13]
 {¶ 34} It appears Cahill does not contend the amount of fees awarded was unreasonable. Rather, his argument is limited to the issue of whether any attorney fees should have been awarded. Thus, we proceed to examine that issue.
 {¶ 35} The initial overriding consideration is the financial ability of the individual in question to meet the demands of any award.[14] Not only must the award be within the individual's ability to pay, but it must also leave that individual the means to maintain his own health and well being by obtaining proper food, shelter and clothing, and it must not burden him to the extent his incentive to pay is destroyed.[15]
 {¶ 36} Upon close examination of the record, we conclude the trial court adequately addressed this issue. The court based this finding on the fact Cahill had a combined income of $75,000 from his full-time job and his two subchapter "S" corporations. We conclude this sufficiently addressed the factor of Cahill's "ability to pay" as required by R.C.3105.18(H) and, thus, the trial court did not abuse its discretion in that regard.
 {¶ 37} We conclude there was no abuse of discretion in the trial court awarding spousal support and attorney fees. Accordingly, we overrule Cahill's sole assigned error.
Judgment affirmed.
Michael J. Corrigan, P.J., and Ann Dyke, J., concur.
[1] 1Carney v. Carney (Sept. 22, 2000), 6th App. Dist. No. E-99-016.
[2] Bolinger v. Bolinger (1990), 49 Ohio St.3d 120.
[3] Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67; Cherry v. Cherry
(1981), 66 Ohio St.2d 348, 352.
[4] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[5] Layne v. Layne (1992), 83 Ohio App.3d 559, 562-563.
[6] Kaechele v. Kaechele (1988), 35 Ohio St.3d 93, 94.
[7] Buckles v. Buckles (1988), 46 Ohio App.3d 102, 110.
[8] Badovick v. Badovick (1998), 128 Ohio App.3d 18, citing R.C.3105.171(A)(2); Berish v. Berish (1982), 69 Ohio St.2d 318, 321, 23 O.O.3d 296.
[9] Magistrate's Decision p. 3
[10] Rogers v. Rogers (Sept. 2, 1997) 10th. App. Dist. Nos. 96 APF10-1333 and 97 APF01-67.
[11] Yearwood v. Yearwood (Nov. 17, 1995), 2nd App. Dist. No. 15103.
[12] Swanson v. Swanson (1976), 48 Ohio App.2d 85.
[13] 13 McCoy v. McCoy (1993), 91 Ohio App.3d 570, 583, citingSwanson, supra; Oatey v. Oatey (1992), 83 Ohio App.3d 251, 263; Birathv. Birath (1988), 53 Ohio App.3d 31, 39.
[14] See Rivers v. Rivers (1965), 14 Ohio App.2d 120.
[15] Blaney v. Blaney (Iowa 1964), 256 Iowa 1151, 130 N.W.2d 732, 733. See Coleman v. Coleman (Mo.App. 1958), 318 S.W.2d 378.